## IN THE COURT OF COMMON PLEAS
## CUYAHOGA COUNTY, OHIO

| | |
|---|---|
| **CHANTELLE GLASS**<br>3650 Independence Road<br>Cleveland, OH 44105<br><br>*Plaintiff,*<br><br>v.<br><br>**IDRIS-FARID CLARK** (in his official and<br>individual capacities)<br>25791 Talkwood Drive<br>North Olmsted, Ohio 44070,<br><br>**ROBERT MARSH** (in his official and<br>individual capacities)<br>6414 Thornton Drive<br>Parma, Ohio 44129,<br><br>and<br><br>**CUYAHOGA COUNTY**<br>2079 East Ninth Street<br>Cleveland, Ohio 44115<br><br>*Defendants.* | Case No.<br><br>Judge |

### COMPLAINT WITH JURY DEMAND[1]

### NATURE OF ACTION

1.      This is a civil-rights action brought to redress an act of torture perpetrated by two corrections officers who restrained, punched, and pepper sprayed Chantelle Glass for asking to make a phone call, and to hold Cuyahoga County responsible for adopting a custom, policy, or practice of brutalizing incarcerated citizens, failing to properly train its employees, and coddling the corrections officers who perpetrate sadistic violent acts against the people in their custody.

---

[1] Submitted by manual filing are discs containing video footage from a stationary surveillance camera (**Ex. 1**) and a body-worn camera (**Ex. 2**) depicting the attack Ms. Glass endured and some of her suffering afterward. Cuyahoga County withheld these videos from Ms. Glass until she filed an action for writ of mandamus with the Supreme Court of Ohio to obtain these public records.

## PARTIES

2.     Plaintiff Chantelle Glass resides in Cleveland, Ohio.

3.     Defendant Idris-Farid Clark is a corrections officer with the Cuyahoga County

Corrections Center and resides in North Olmsted, Ohio. At all times relevant, he was in uniform,

and acting under color of state law.

4.     Defendant Robert Marsh is a corrections officer with the Cuyahoga County Corrections

Center and resides in Parma, Ohio. At all times relevant, he was in uniform, and acting under

color of state law.

5.     Defendant Cuyahoga County is a political subdivision of the State of Ohio responsible for

the Cuyahoga County Corrections Center ("the county jail" or "the jail").

## JURISDICTION AND VENUE

6.     This Court has jurisdiction because the suit concerns state-law violations by Defendants

and the amount in controversy exceeds $15,000.

7.     The suit concerns civil liability for acts that occurred in this county.

8.     Venue is proper here because the events at issue took place in this county.

## FACTUAL BACKGROUND

### Police arrest Ms. Glass on an old misdemeanor warrant from New Jersey and book her into the county jail.

9.     On July 16, 2018, Cleveland police responded to an incident at Ms. Glass's mother's

home, where Ms. Glass's sister had engaged in self-harm. While there, police apparently ran a

warrant check and discovered an old misdemeanor warrant from New Jersey for Ms. Glass.

Police arrested her and booked her into the county jail.

10.    After being booked, Ms. Glass requested a phone call to alert her immediate family to her

situation or to find a lawyer.

Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB

11.    Various corrections officers refused to allow Ms. Glass to make a call.

12.    A corrections officer threatened to lock Ms. Glass in a chair for "getting smart" with her.

13.    Another corrections officer told her: "you don't get a phone call because she [another corrections officer] told me that you got a smart-ass mouth and you don't need a phone call."

14.    Ms. Glass continued to demand a phone call.

15.    When Ms. Glass persisted in her request after being placed in a holding cell, corrections officers threatened that if she did not stop, they would tie her down and "mace" her.

16.    When Ms. Glass did not stop asking for her phone call, corrections officer Jazmyne Jackson became angry and called her supervisor, Defendant Idris-Farid Clark. In his supervisory role, Defendant Clark exercises policymaking authority for Defendant Cuyahoga County.

17.    Defendant Clark and corrections officer Defendant Robert Marsh responded at approximately 8:20 p.m. While Defendant Marsh retrieved a restraint chair, Defendant Clark shook up his can of pepper spray and put it into a front pocket on this tactical vest.

18.    The following photo is a still image from the surveillance camera showing Defendant Clark shaking his can of pepper spray before Ms. Glass was brought to the chair to be restrained:



**Ms. Glass cooperates as Defendants Marsh and Clark confine her to a restraint chair—for requesting a phone call.**

19.     Defendants Marsh and Clark walked Ms. Glass, who was handcuffed behind her back, out of her holding cell and toward the restraint chair, which was positioned in the corner of an open area in the center of the pod.

20.     The following photo is a still image from the surveillance camera showing Ms. Glass being led to the restraint chair by Defendant Marsh with Defendant Clark following behind as two other corrections officers looked on:



21.     Ms. Glass, wearing a white tea-length dress, walked to and sat down in the restraint chair as instructed.

22.     The following photo is a still image from the surveillance camera showing Ms. Glass sitting down in the restraint chair as instructed:



23.     Defendant Marsh secured the restraint chair's waist strap across Ms. Glass's midsection.

24.     The following photo is a still image from the surveillance camera showing Defendant

Marsh securing the waist strap across Ms. Glass's midsection:



25.     Ms. Glass was compliant with the officers and did not resist being strapped into the restraint chair.

26.     After securing the waist strap, Defendant Marsh grabbed Ms. Glass's handcuffs behind her back and yanked them upwards, stretching her arms unnaturally. His ample girth appeared to impede his ability to position himself so he could successfully reach the handcuffs. He then aggressively pushed his left elbow into the back of her neck to force her head down into her lap

Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB

before fumbling to unlock the handcuffs with his cumbrous belly wedged above her back. Ms. Glass remained compliant despite this manhandling.

27.   The following photos are still images from the surveillance camera showing Defendant Marsh yanking Ms. Glass's arms, holding her head down, and removing the handcuffs from her wrists:



28.   Once Defendant Marsh removed her handcuffs, Ms. Glass remained compliant and allowed Defendant Marsh to strap her left wrist to the restraint chair. She remained compliant while he strapped her left shoulder to the restraint chair.

29.   Ms. Glass remained compliant while Defendant Marsh strapped her right shoulder to the restraint chair. She remained complaint while he strapped her right wrist to the restraint chair.

**Once Ms. Glass's waist, wrists, and shoulders are strapped securely in the restraint chair, Defendant Clark pulls out and shakes his pepper spray.**

30.     After Defendant Marsh strapped Ms. Glass's waist, wrists, and shoulders to the restraint chair, Defendant Clark took his can of pepper spray—which he had shaken earlier—out of his tactical vest.

31.     The following photo is a still image from the surveillance camera showing Defendant Clark removing his can of pepper spray from his tactical vest after Defendant Marsh had secured her waist, wrists, and shoulders to the restraint chair and was further tightening the straps:



32.  While Defendant Marsh plodded behind her, cinching the restraint chair's straps, Defendant Clark stood in front of Ms. Glass again shaking his pepper spray.

33.  The following photo is a still image from the surveillance camera showing Defendant Clark again shaking his pepper spray as Defendant Marsh cinches the restraint chair's straps:



34.  During this time, Ms. Glass repeatedly stretched her right leg. None of the four corrections officers in the room reacted to her stretching or instructed her to stop moving her leg.

35.  With his strap-fiddling complete, Defendant Marsh lumbered to Ms. Glass's left, and Defendant Clark moved from in front of her to her right (still shaking his can of pepper spray).

**Ms. Glass flinches as Defendant Marsh reaches between her legs; he punches her in the face and Defendant Clark empties the can of pepper spray into her face.**

36.    Another corrections officer stepped up behind the restraint chair and began tilting it backward. None of the corrections officers explained to Ms. Glass why they were tilting the chair backwards.

37.    As the other corrections officer tilted back the restraint chair to which Ms. Glass was strapped, Defendant Marsh reached between Ms. Glass's knees and she recoiled, reflexively drawing her legs together in fear.

38.    The following photo is a still image from the surveillance video showing Defendant Marsh reaching his hand between Ms. Glass's knees:



39.    Defendant Marsh briefly stepped back. Aside from her instinctive response to a strange man reaching between her legs, she made no further movements with her legs and no effort to resist or harm him or any of the other four large male corrections officers in the room. And, in

any event, Ms. Glass—strapped into the restraint chair—could not reach him even if she wanted to.

40.      Despite being completely safe and out of harm's way, Defendant Marsh stepped back toward Ms. Glass and struck her in the head.

41.      The following photo is a still image from the surveillance camera showing Defendant Marsh hitting Ms. Glass in the head while she is strapped in the restraint chair:



42.      Before Defendant Marsh punched Ms. Glass, she made no effort to resist in any way and was complying with the Defendants' commands (other than failing to discontinue her requests for a phone call). Her reflexive response of quickly drawing her legs together was not an effort to attack any corrections officer. It was a completely reasonable, understandable, and instinctual response for Ms. Glass to squeeze her knees together as Defendant Marsh reached between her legs. No reasonable corrections officer would have perceived her movement as aggressive or resisting.

Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB

43.    Once Defendant Marsh punched Ms. Glass in the head, she flailed to protect herself, kicking at him with her legs to stop his attack. Rather than step back and place themselves entirely outside of Ms. Glass's limited range, Defendant Clark leapt at an opportunity to deploy the pepper spray he had been readying since before they began strapping her into the chair.

44.    Defendant Clark emptied the entire can of pepper spray on to Ms. Glass's face from less than six inches away.

45.    The following photos are still images from the surveillance video showing Defendant Clark pepper spraying Ms. Glass while she was strapped in the restraint chair:





Electronically Filed 07/09/2019 22:31 / / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB

46.    Ms. Glass attempted to turn her head away from the pepper spray, but Officer Clark continued to torture Ms. Glass with pepper spray in her eyes, grabbing her by the hair to prevent her from turning her head to avoid the direct line of spray.

47.    The following photos are still images from the surveillance camera showing Defendant Clark grabbing Ms. Glass's hair to prevent her from turning her head to avoid the direct line of spray:





Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB



**Defendant Clark proclaims he tortured Ms. Glass "because she talk[s] too much" and "should not have gotten smart."**

48.     Defendant Clark admitted that he had no legitimate reason to deploy his pepper spray. Ms. Glass asked Defendant Clark: "Why did you mace me?" Defendant Clark responded: "Because you talk too much."

49.     Ms. Glass began crying and stated: "Please stop. I'm sorry. I didn't do nothing." He responded: "You should not have gotten smart."

50.     Getting "smart" is not a reason to strap and human being into a restraint chair.

51.     Getting "smart" is not a reason to pepper spray a human being who is strapped to a restraint chair.

52.     At the time Defendant Clark deployed his pepper spray, Ms. Glass posed no danger to anyone.

53.     Four or more other corrections officers were in the room as Defendants Marsh and Clark attacked Ms. Glass but did nothing to stop them from hurting her.

54.     After deploying the pepper spray, Defendants Marsh and Clark secured the restraint chair's lower straps around Ms. Glass's ankles.

55.     The following photo is a still image from the surveillance camera of Defendants Marsh and Clark securing Ms. Glass's ankles to the restraint chair:



56.     After her ankles were strapped to the chair, Ms. Glass struggled to breathe and her chest visibly heaved.

57.     Defendant Clark then wheeled Ms. Glass out of the pod in the restraint chair.

58.     The following photo is a still image from the surveillance camera showing Defendant Clark wheeling Ms. Glass from the pod with pepper spray all over her face as other corrections officer looked on:

Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB



59.     Only after Defendant Clark pepper sprayed Ms. Glass did he turn on his body-worn camera.

### After the attack concludes, Defendants leave Ms. Glass covered in pepper spray and deny her prompt and adequate medical care.

60.     After the attack concluded, Ms. Glass was in excruciating pain and gasping for breath. She cried out in anguish, alerting the corrections officers that she was having trouble breathing because she had asthma.

61.     Each time Ms. Glass said she couldn't breathe, one or more corrections officers responded by saying, "If you talkin' you can breathe" or words to that effect.

62.     The corrections officers were in no hurry to employ decontamination protocols or ensure Ms. Glass had a medical assessment (which was particularly urgent in light of her asthma).

63.     Despite her reported breathing condition, Defendant Clark's body-worn camera shows him slowly wheeling Ms. Glass into the elevator and transporting her from the fourth floor to the sixth floor.

Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB

64.    The following photo is a still image from Defendant Clark's body-worn camera showing SRT officer Perdue and another officer in the elevator with Defendant Clark and Ms. Glass:



65.    Once they arrived on the sixth floor, Defendant Clark slowly wheeled Ms. Glass into a utility closet used to fill up buckets with mop water. SRT officer Frederick Barthany stood in the doorway watching.

66.    The following photo is a still image from Defendant Clark's body-worn camera showing him wheeling Ms. Glass into the closet:



67. Corrections officers unduly delayed beginning decontamination procedures to remove the pepper-spray residue from Ms. Glass. This delay was intended to prolong her agony. And it had its intended effect.

68. Once in the closet, Defendant Clark stood around for 30 seconds doing nothing.

69. From the time Defendant Clark wheeled Ms. Glass into the utility closet, the "O.C. Administrative Warning To Be Given To Any Person Exposed To O.C." sheet ("the sheet") was on the closet door and plainly visible.

70. There was no reason that Defendant Clark or of the other corrections officers could not have read Ms. Glass the administrative warning during transport from the pod, up the elevator, and down the hall to the closet. Any officer qualified to administer pepper spray should have "the sheet" readily accessible on his or her person or memorized so as to be able to avoid any undue delay in beginning decontamination procedures.

71. The following photos are still images from Defendant Clark's body-worn camera showing SRT officer Barthany standing in and leaning on the closet doorway before eventually reaching for "the sheet" on the closet door while Defendant Clark putzes around and Ms. Glass writhes in agony:



Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB



72.    More than 30 seconds after Clark wheeled Ms. Glass into the closet, SRT officer

Barthany (as pictured above) took a copy of "the sheet" off the door—which had been hanging

there the whole time—and asked Defendant Clark if he wanted Barthany to read it. Clark

agreed. As Barthany read "the sheet" (as described below), other corrections officers stood

watching in amusement from the hallway (including Defendant Marsh, SRT officer Perdue, a

thin black male corrections officer, a shorter white male corrections officer with glasses and a

baseball cap, and a white male corrections officer with the glasses and graying beard).

73.    The following photos are still images from Defendant Clark's body-worn camera showing

SRT officer Barthany preparing to read "the sheet" to Ms. Glass as other corrections officer

looked on:



74. For approximately one minute and 15 seconds, SRT officer Barthany and Ms. Glass had

the following exchange as Barthany read "the sheet" to Ms. Glass:

| | |
|---|---|
| Barthany: | Listen up. |
| Glass: | Okay! |
| Barthany: | You have been contaminated with OC a natural product derived from cayenne peppers. |
| Glass: | Ahhh! |
| Barthany: | I am going to treat you to reduce the discomfort you are feeling as long as you cooperate. |
| Glass: | Okay, I will! |
| Barthany: | Listen. OC is non-toxic and the effects will dissipate in a short time. |
| Glass: | Okay! |
| Barthany: | The effects of OC may however mask or cover other medical conditions… |
| Glass: | I got asthma! |
| Barthany: | Hold on. |
| Glass: | I cannot breathe! |
| Barthany: | You gotta stop interrupting me. Or it's gonna take longer. Including overdose… |
| Glass: | Okay. |
| Barthany: | Listen. Or toxic levels of drugs like cocaine, amphetamines… |

| | |
|---|---|
| Glass: | Okay. |
| Barthany: | …barbiturates… |
| Glass: | [sobbing] |
| Barthany: | …PCP, opiates, heroin… |
| Glass: | Aaaaah! |
| Barthany: | …or alcohol. |
| Glass: | Aaaaah! |
| Barthany: | I am going to ask you five questions for your own safety. Not answering my questions withholding… |
| Glass: | Yes! Yes! Yes! |
| Barthany: | …information or giving false or misleading answers… |
| Glass: | Please, sir! |
| Barthany: | …could delay medical treatment and may severely jeopardize your health and safety. |
| Glass: | Okay! |
| Barthany: | Okay. Are you currently under the influence of cocaine, |
| Glass: | No! |
| Barthany: | …amphetamines… |
| Glass: | No! No! No! |
| Barthany: | …barbiturates—listen— barbiturates, PCP, opiates, |
| Glass: | No! No! |
| Barthany: | …heroin, or alcohol? Have you taken cocaine… |
| Glass: | No! |
| Barthany: | …amphetamines, barbiturates, PCP, opiates, heroin, or alcohol… |
| Glass: | No! [sobbing] |
| Barthany: | …in the last eight hours? |
| Glass: | No! |
| Barthany: | Do you normally take any illegal drugs… |

| Glass: | No! No! |
|---|---|
| Barthany: | …or prescription drugs? |
| Glass: | No! [screaming] |
| Barthany: | Do you have heart problems… |
| Glass: | No! [screaming] |
| Barthany: | …lung problems, diabetes… |
| Glass: | No! [sobbing] |
| Barthany: | …high blood pressure, or any other… |
| Glass: | No! [screaming] |
| Barthany: | …serious medical condition? Do you have allergies? |
| Glass: | No! Please! [begging] |
| Barthany: | Alright. |

75.     The following photos are still images from Defendant Clark's body-worn camera showing

various employees of the Defendant County (some in apparent amusement) observing Ms.

Glass's agony from the closet doorway as SRT officer Barthany belabored the recitation of "the

sheet:"



 



76.     After SRT officer Barthany finished reading "the sheet," and approximately two minutes

after wheeling her into the closet, Defendant Clark finally began the supposed

"decontamination" (although what he did was not remotely effective in decontaminating Ms.

Glass of the pepper-spray residue left behind after he attacked her).

77.     Defendant Clark spent more time spraying Ms. Glass in the face with his pepper spray

than he spent rinsing off the pepper-spray residue.

78. Defendant Clark sloshed hose water on top and to the left of Ms. Glass's head three times for less than two seconds each time. This did not remove the pepper-spray residue.

79. The following photos are still images from Defendant Clark's body-worn camera showing each of the three brief hose splashes that constituted the entirety of Defendant Clark's effort to decontaminate Ms. Glass of the pepper-spray residue:



80. In between splashes, SRT officer Perdue stood in the doorway, observed Ms. Glass in agony, and grinned at SRT officer Barthany.

81. The following photo is a still image from Defendant Clark's body-worn camera showing SRT officer Perdue smiled at Barthany:

Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB



82.     During none of the three splashes did Defendant Clark even try to ensure the water was actually removing the pepper-foam residue. Defendant Clark predominantly directed the hose spray at the top and left of Ms. Glass's head and didn't remove the pepper from where he had sprayed her directly in the face.

83.     The haphazard, half-hearted manner in which Defendant Clark splashed hose water on Ms. Glass is not consistent with standard or appropriate protocols for decontaminating the victim of a pepper-spray attack. This failure to properly decontaminate her by effectively removing the pepper-spray residue was designed to extend the torture and perpetuate her suffering.

84.     After the "decontamination," the orange-red pepper-spray residue was clearly visible on Ms. Glass's skin and clothing.

85.     Water alone will not remove pepper-spray residue.

Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB

86.     Defendant Clark used no cleaning agent to remove the pepper-spray residue. This failure was intentional and designed to prolong Ms. Glass's agony, which it did.

87.     The following photo is a still image from Defendant Clark's body-worn camera showing Ms. Glass in evident agony with visible pepper-spray residue on her clothing after Defendant Clark discontinued all of his supposed efforts to "decontaminate" her:



88.     Throughout her stay in the jail, Ms. Glass was denied soap or any other cleaning agent that would have removed the pepper-spray residue.

89.     The water Defendant Clark sloshed on Ms. Glass did not remove the pepper-spray residue, but it did have the expected effect on her white dress (which was now not only hiked up around her hips but also damp and clinging to her body). Her legs shook and splayed as she writhed in agony.

90.     After splashing Ms. Glass with water, Defendant Clark wheeled her down the hall to the infirmary.

91.    The following photo is a still image from Defendant Clark's body-worn camera showing Ms. Glass with visible pepper-spray residue on her clothing as Defendant Clark wheeled her from the closet to the infirmary:



92.    Neither Defendant Clark nor any other corrections officer attempted to cover Ms. Glass's while wheeling her down the hall and into the co-ed infirmary where numerous male corrections officers and males in custody stared as Defendant Clark pushed her into the room tilted back in the restraint chair in a soaked and clinging white garment hiked up to her hips.

93.    The following photo is a still image from Defendant Clark's body-worn camera showing numerous men ogling Ms. Glass as Defendant Clark wheeled her into the infirmary:

Electronically Filed 07/09/2019 22:31 /  / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB



**Nurse Diane Lessmann treats Ms. Glass with contempt and winks at and laughs with corrections officers as Ms. Glass begs for help.**

94.     Defendant Clark wheeled Ms. Glass into the medical area at approximately 8:35 p.m.

95.     Having access to medical personnel did not improve matters given the medical staff's participation in the corrections officers' deliberate indifference to and apparent enjoyment of Ms. Glass's agony.

96.     Once in the medical area, Ms. Glass continued to beg for water and for her face to be wiped.

97.     Even the jail medical staff, specifically Diane M. Lessmann, R.N., responded with deliberate indifference to Ms. Glass's evident agony.

98.     Like the corrections officers, Lessmann mocked Ms. Glass's cries about her struggles to breathe, repeatedly echoing their refrain about her being able to breathe: "You're breathin' or you wouldn't be screamin'."

99.     Lessmann behaved in a cruel and indifferent manner toward Ms. Glass, failing to provide any appreciable medical care.

100.    Lessmann did not ask Ms. Glass for her name.

101.    Lessmann did not attempt to comfort or reassure Ms. Glass in any way.

102.    Lessmann did not explain what Ms. Glass was experiencing or describe what steps would be taken to abate her pain.

103.    Lessmann did not even identify herself as a nurse.

104.    As Ms. Glass shook and writhed in pain, Lessmann told her to sit still.

105.    The following photos are still images from Defendant Clark's body-worn camera showing SRT officer Perdue and Lessman seemingly unmoved by Ms. Glass's evident distress:





Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB



106. Lessmann ignored Ms. Glass's pleas for water.

107. While Lessmann went through the motions of performing supposed medical "care," numerous corrections officers sat staring at the scene, doing nothing to ensure Ms. Glass was properly attended to.

108. Lessmann did nothing to extinguish Ms. Glass's agony beyond half-heartedly dabbing at her eyes with a gauze pad. Lessmann waited approximately four minutes after Ms. Glass arrived in the infirmary to do so.

109. Lessmann did not flush Ms. Glass's eyes with water to ensure that they were properly decontaminated.

110. Ms. Glass remained unable to open her eyes, so in addition to the pain of being pepper sprayed, she was also enduring the disorientation and fear of being unable to see where she was or what was happening to her.

111. Lessmann made no effort to comfort Ms. Glass, saying nothing in response to her pleas.

112.    Ms. Glass remained in agony and feared for her life, begging not to be killed: "I swear to God I'm about to die here. Please don't kill me."

113.    Lessmann squinched her eyes in mockery when Ms. Glass begged them not to kill her.

114.    The following photo is a still image from Defendant Clark's body-worn camera showing Lessman's reaction to Ms. Glass's pleas that they not kill her:



115.    On information and belief, Ms. Glass's blood pressure was dangerously high when she entered the infirmary, and the photo above shows SRT officer Perdue and Lessman watching the blood-pressure monitor waiting for Ms. Glass's blood pressure to return to a low enough level to return Ms. Glass to a cell.

116.    Lessmann did not confirm that Ms. Glass had been properly decontaminated from the pepper foam. The pepper foam was still visible on Ms. Glass while she was under Lessmann's "care," and any reasonable healthcare provider would have observed the residue and addressed it. But Lessmann did not confirm that corrections staff had properly decontaminated Ms. Glass. Lessmann made no effort to properly decontaminate Ms. Glass or abate her agony.

117.   No one removed Ms. Glass's contaminated clothing or gave her a change of clothing.

118.   Ms. Glass remained in evident agony and was still visibly covered in pepper-spray residue, but Lessmann nevertheless failed to provide appropriate care and instead appeared to celebrate Ms. Glass's pain with the corrections officers. As Ms. Glass continued to scream in pain, Lessmann winked at Defendant Clark saying, "She's done."

119.   The following photo is a still image from Defendant Clark's body-worn camera showing Lessman winking at Ms. Glass's torturer, Defendant Clark:



120.   Only after pronouncing that Ms. Glass was "done" did Lessmann ask Defendant Clark for her SO# or name, presumably to complete the required paperwork to document the "care" Lessmann administered.

121.   In total, Ms. Glass spent approximately six minutes in the medical area.

122.    As Perdue wheeled Ms. Glass out of the medical area, Lessmann joined in with the assembled corrections officers laughing at Ms. Glass and joking about taking her out the same way she came in so she would only "leave a trail that way" (referring to the water dripping containing pepper-spray residue that had not been removed from Ms. Glass despite "decontamination" and "medical care").

123.    The following photo is a still image from Defendant Clark's body-worn camera showing Perdue wheeling Ms. Glass out of the infirmary while Lessman laughs with the corrections officers about Ms. Glass:



124.    The following photo is a still image from Defendant Clark's body-worn camera showing other employees of the Defendant County laughing at Ms. Glass as Perdue wheels her from the infirmary with pepper-spray residue still visible on her clothing and body:





125.  The failure to appropriately decontaminate Ms. Glass caused her additional pain and suffering and resulted in the pepper spray migrating from her face and décolletage to other parts of her body.

### After the useless stop in the medical unit, Ms. Glass is put in an isolation cell still covered in pepper-spray residue.

126.  From the medical unit, Perdue wheeled Ms. Glass back to the elevator. She continued to express that she could not breathe. Corrections officers responded uncaringly, "Yes, you can."

127.  She asked for more water to be poured on her face. Corrections officers ignored her.

128.  The following photos are still images from Defendant Clark's body-worn camera showing Perdue and other corrections officers waiting for the elevator as Ms. Glass cries out in pain (with visible pepper-spray residue on her clothing and skin):

 

129.  Corrections officers transported Ms. Glass back to the fourth floor, still taking no steps to cover her exposed body or protect her modesty in any way.

130.  The following photo is a still image from Defendant Clark's body-worn camera showing Ms. Glass being wheeled into the elevator by Perdue:



131.    Ms. Glass remained unable to open her eyes. As she was wheeled down the hallway, an officer announced that she was "about to go sit in the wait room." The officers, including Defendant Clark, Perdue, and others, then placed her alone in an isolation cell.

132.    The following photo is a still image from Defendant Clark's body-worn camera showing Ms. Glass alone in an isolation cell:



133.    The officers left Ms. Glass alone in the restraint chair in an isolation cell, still covered in pepper-spray residue. They did not remove her from the restraint chair until approximately 10:50 p.m.

134.    Ms. Glass spent over two hours alone in the isolation room, strapped into a restraint chair and covered in pepper-spray residue—all for having requested a phone call.

135.    When Ms. Glass called out saying that she had to use the bathroom, a corrections officer responded that she had to wait. But she was unable to wait, so she had no choice but to urinate on herself, further compounding her degradation and humiliation.

### After leaving Ms. Glass alone in the restraint chair for hours, officers direct her back to her original cell—but she still remains covered in pepper-spray residue.

136.    When corrections officers returned to remove her from the restraint chair, they directed her to walk back to her original cell, but she could not see because her eyes were still impaired due to the failure to effectively remove the pepper-spray residue

137.    While locked in the cell, Ms. Glass repeatedly begged corrections staff for a shower because she was still burning from the pepper spray and had been forced to urinate on herself while in the isolation cell.

138.    For her entire 48-hour stay in the jail, corrections staff denied Ms. Glass's request to shower.

139.    For her entire 48-hour stay in the jail, Ms. Glass remained in the same clothing contaminated with pepper spray.

140.    Ms. Glass was released on July 18, 2018 after New Jersey officials confirmed that they did not want her extradited on the misdemeanor warrant.

141.    Ms. Glass continued to experience burning sensations all over her body for the next two weeks.

Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB

142.    The manner in which Defendants Marsh and Clark perpetrated the vicious attack on Ms. Glass suggests that this type of violence is a standard occurrence in this facility.

143.    The manner in which the other corrections staff who witnessed the attack and the failure to promptly and effectively decontaminate Ms. Glass—and the ho-hum way they reacted in the face of such sadistic violence and brutal agony—demonstrates that Cuyahoga County wantonly, willfully, recklessly, maliciously, and in bad faith cultivates, perpetuates, and encourages a culture of punitive abuse including a custom, policy, and practice of using excessive force, failing to provide medical care to victims of corrections-officer attacks, and a general failure to train staff on how to act like decent human beings (or hire staff that act like decent human beings in the first place).

144.    The following photos are still images from Defendant Clark's body-worn camera showing the faces of various jail employees as they witnessed Ms. Glass's agony; these are the faces of deliberate indifference:

    

145.    The employees whose photos appear above are participating in the culture of deliberate indifference that permeates the jail. This is what the citizens incarcerated at the jail see. This is what the other corrections officers see. And this is what Ms. Glass would have seen if she wasn't unable to open her eyes because she had been peppered sprayed at close range on camera by a government employee freely engaged in a ritual of torture without any apparent concern that there would be consequences for restraining and pepper spraying someone for having a "smart mouth."

146.    Any reasonable human being who witnessed any aspect of the brutal attack on Ms. Glass

or the failure to decontaminate her would have responded with horror and alarm. But each and

every member of the jail staff who observed what happened to Ms. Glass and the aftermath

responded casually as if this was something they see regularly.

147.    The culture of deliberate indifference so permeates the jail that even some medical

personnel—who presumably selected their profession because at some time in their lives they

actually wanted to help people—participate in the indifferent and dehumanizing treatment of the

people in custody.

148.    The following photos are still images from Defendant Clark's body-worn camera showing

Nurse Diane Lessmann as she "cared" for Ms. Glass. This was less than months after Cuyahoga

County Executive Armond Budish had secured the retaliatory firing of nursing supervisor Gary

Brack, R.N. for publicly advocating at a County Council meeting about the need for better

patient care. In the wake of Nurse Brack's firing, this is the face of medical care at the Cuyahoga

County jail:



149.    Throughout Ms. Glass's two-day stay in the county jail, no one every properly or

effectively decontaminated her. On information and belief, this failure was intentional and

intended to prolong the agony Defendant Clark inflicted on Ms. Glass.

Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB

150. Defendants Idris-Farid Clark and Robert Marsh were indicted for attacking Ms. Glass.

151. None of the other corrections officers who watched the attack have been held accountable.

152. Ms. Glass was injured as a result of the judgment or discretion of Cuyahoga County officials exercised to punish a pre-trial detainee for asking for a phone call and compounded by the failure to employ rudimentary decontamination protocols or provide adequate medical care. As the videos attached to this complaint show, officials of the Defendant County exercised discretion with malicious purpose, in bad faith, or in a wanton and reckless manner sufficient to overcome standard political-subdivision immunity.

153. The Defendant County interfered with Ms. Glass's ability to collect evidence of the torture she experienced. On April 24, 2019, Ms. Glass made a public-records request to the Defendant County for the video of the attack. But the Defendant County did not provide the videos until after Ms. Glass filed a petition for writ of mandamus with the Supreme Court of Ohio. Only then did the Defendant County provide Ms. Glass with the videos attached to this complaint.

154. And the Defendant County and its leadership also sought to further cover up the continuing torture of Ms. Glass by failing to produce the Defendant Clark bodycam video to media who had submitted public-records requests that encompassed it.

### OTHER INCIDENTS RESULTING FROM THE MALICIOUS, BAD-FAITH, WANTON, AND RECKLESS EXERCISE OF DISCRETION AT THE COUNTY JAIL

155. In addition to the above-described attack on Ms. Glass, corrections staff, as part of a custom, policy, pattern, and practice, have perpetrated many additional unprovoked and unwarranted acts of violence on the people incarcerated in the jail. Some of those acts are described in the following paragraphs.

### A corrections officer smashed Joshua Castleberry's teeth into his nose for throwing a bologna sandwich.

156.    On February 5, 2018, Joshua Castleberry was in the county jail. He secreted an extra bologna sandwich from the dining hall to his cell, and, when nabbed, he threw the sandwich at corrections staff. The officers' response to the indignity was savage. After handcuffing Mr. Castleberry, officers John Wilson and Jason Jozwiak smashed Mr. Castleberry's face so violently into the ground that his front teeth came out of his nose. They placed him in a restraint chair and jammed a mask over his broken face to conceal their assault from medical staff.

157.    At the time, Ken Mills was the administrator of the jail. His officers refused to let nursing staff remove the mask to assess Mr. Castleberry's injuries, but a night nurse saw Mr. Castleberry and requested medical evaluation. The security supervisor refused, saying: "he wants to try and hit one of my officers — he can sit the fuck there for hours."

158.    So, the night nurse called the nursing supervisor — Gary Brack, R.N. — at home, reporting a serious medical emergency. Nurse Brack called the staff sergeant in charge and demanded a medical evaluation, but the Defendant County waited another half-hour before transporting Mr. Castleberry to medical. The mask was lifted, EMS was called, and Mr. Castleberry was transported to the hospital for surgery to remove the tooth from his nasal cavity and reconstruct his face.

159.    The next day at the monthly sheriff's meeting, then-warden Ken Mills covered up the abuse. When asked about the incident, Mills stated: "I reviewed the situation and the officers used appropriate force to the threat of what the inmate was using." Medical Director Dr. Thomas Tallman asked to view the security footage, but Mills refused, saying: "I already reviewed it — nothing was done wrong."

Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB

160.    Sheriff Clifford Pickney stated that he would follow up with the incident, but when he

went to review the footage, the security and body-camera footage had somehow "disappeared."

161.    Wilson was indicted for felonious assault in the second degree and misdemeanor charges

of interfering with civil rights and unlawful restraint. Jozwiak was charged with unlawful restraint

and interfering with civil rights.

162.    No one else was held accountable.

**A corrections officer choked and dragged Tyrone Hipps, Jr. because
he complained about being denied the opportunity to pray as his faith
requires.**

163.    Tyrone Hipps was booked into the county jail on June 22, 2018. He informed the officers

that he is a Muslim and requested a no-pork diet.

164.    Practicing Muslims must pray five times per day, facing east toward the holy city of

Mecca.

165.    On November 3, 2018, Mr. Hipps was preparing to pray at the eastern end of the

dormitory when Officer Christopher Perdue—the same SRT officer discussed above—

approached Mr. Hipps and told him to go to his bed area. Mr. Hipps explained that he was

about to pray. Perdue said: "Pray by your bed." Mr. Hipps explained that praying by his bed was

improper because he is required to pray facing the east with no one walking in front of him.

Perdue then told Mr. Hipps to go pray in the day area. Mr. Hipps explained that praying in the

day area would also be improper because people would still be in front of him while he was

praying. Mr. Hipps tried to explain the importance of observing proper prayer protocols.

166.    In response to Mr. Hipps's explication of his religious custom, Perdue threatened to send

Mr. Hipps to the hole. Mr. Hipps asked Perdue to get the corporal to resolve the issue. Perdue

left, returned a few seconds later (without the corporal), and threatened: "I'm going to give you

three chances to move, if you don't move by the third, I'm going to move you myself."

167.    Mr. Hipps complied with Perdue's command, picked up his prayer rug, and walked towards his bunk. He said: "This is my religion. I could sue you for this." Perdue responded: "I'll give you something to sue for." Perdue grabbed Mr. Hipps and put him in a chokehold. Perdue dragged Mr. Hipps to the front of the pod, threw him on his face, and told him to stop resisting.

168.    Another officer had to physically remove Perdue from Mr. Hipps.

169.    Despite having done nothing wrong, Mr. Hipps spent the next five days in the hole.

170.    He remained in the hole for two days after an investigator visited Mr. Hipps in the hole and confirmed that the video showed he had done nothing wrong.

171.    Despite Perdue's vicious attack on Mr. Hipps, jail administration did not place Perdue on leave or even separate Perdue from Mr. Hipps. Perdue constantly taunted Mr. Hipps when he returned from the hole.

172.    No one has been held accountable for attacking Mr. Hipps.

### A corrections officer brutally attacked Corrionne Lawrence without provocation, used racial slurs, and threatened to kill him and "make it look like a suicide" if he reported the attack.

173.    On October 18, 2018, Corionne Lawrence asked corrections officers if he could see a nurse to access his injuries from being attacked by another person in custody. Mr. Lawrence was treated by a nurse and released from medical.

174.    While Sergeant Christopher Little escorted a handcuffed Mr. Lawrence back to his cell from the infirmary, Little told Mr. Lawrence to step to the back of the elevator and face the wall. Mr. Lawrence complied and Sergeant Little stated: "Let's play a game." Little then repeatedly punched Mr. Lawrence in the side of his face, called him a "n*****," and threatened him if he did not keep his mouth shut.

175.    Mr. Lawrence asked another employee, Sergeant Smith, if he could go to the nurse and Smith laughed in Mr. Lawrence's face.

Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB

176.    Mr. Lawrence spent the next 12 days in isolation. Mr. Lawrence was interviewed twice by the United States Marshals Service. During his interview, Mr. Lawrence revealed to the Marshals that he had been assaulted by Little.

177.    Sergeant Smith escorted Mr. Lawrence from the interview and said: "Why you snitching? You a snitch now. Trying to get my boy indicted."

178.    On October 30, 2018, Little told Mr. Lawrence: "N**** I will kill you, hang you, and make it look like a suicide."

179.    Over the past year, at least nine people incarcerated in the jail died, including as a result of apparent suicide by hanging.

180.    No one has been held accountable for attacking or threatening Mr. Lawrence.

### A corrections officer attacked Glenn Mayer, Jr. as he was receiving medication in the infirmary.

181.    Glenn Mayer, Jr. was in the county jail in October 2018. Mr. Mayer has a medical condition that causes him to twitch. Mr. Mayer takes medication to help control his condition.

182.    On October 16, 2018, during the evening medication pass, a nurse was administering Mr. Mayer's medication, steadying his hand to place the medication in his hand. Mr. Mayer began to twitch. Officer Darriell Hayes gripped Mr. Mayer's neck from behind and choked him.

183.    The nurse told Hayes to leave Mr. Mayer alone, that it was normal for him to twitch in that manner due to his condition. Hayes did not cease despite this admonition.

184.    Hayes failed to document his use of force in an incident report, to report his use of force to his immediate supervisor, and to log his use of force into the 6B pod log book, which are all required by the written jail (supposed) policies.

185.    Hayes's attack left Mr. Mayer with temporary paralysis.

186.    No one has been held accountable for attacking Mr. Mayer.

Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB

### A corrections officer beat Terrence Debose while he was strapped into a restraint chair.

187.    On March 22, 2019, a jail corrections officer strapped Terrence Debose in a restraint chair in a small cell. Mr. Debose suffers from mental illness.

188.    While Mr. Debose was restrained, Officer Nicholas Evans turned off his body-worn camera and repeatedly punched Mr. Debose in the face. A screen shot from the jail-surveilance video of the beating follows:



189.    Another corrections officer, Timothy Dugan, entered the room and joined in on the abuse, punching Mr. Debose twice in the face.

190.    As a result of the attack, Mr. Debose suffered a concussion.

191.    Evans was indicted for felonious assault and Dugan was indicted for misdemeanor assault.

192.    The jail held no one accountable.

193.    On information and belief, there are incidents of excessive force by corrections officers—including retaliatory and punitive use of restraints and pepper spray—in addition to those listed above.

**CLAIM 1**
**FOURTEENTH AMENDMENT EXCESSIVE-FORCE VIOLATION**
**UNDER 42 U.S.C. § 1983**
**(AGAINST DEFENDANTS CLARK AND MARSH IN THEIR OFFICIAL AND INDIVIDUAL**
**CAPACITIES)**

194.    Plaintiff incorporates all previous allegations.

195.    Both Defendants Marsh and Clark purposefully or knowingly used objectively unreasonable force against Ms. Glass, a pretrial detainee.

196.    Defendant Marsh had strapped Ms. Glass into a restraint chair before he purposefully and knowingly yanked on her handcuffs and pushed her head down into her lap, holding it down with his elbow and then his hand as he removed the handcuffs. That use of force was unnecessary, gratuitous, and objectively unreasonable.

197.    Ms. Glass was strapped in a restraint chair when Defendant Marsh purposefully and knowingly punched her in the head. Nothing could justify punching a restrained person in the head. That use of force was unnecessary, gratuitous, and objectively unreasonable.

198.    Ms. Glass was strapped in a restraint chair when Defendant Clark purposefully and knowing pepper sprayed Ms. Glass in the face, grabbing her by the hair to prevent her from turning her face to avoid the spray. He pepper-sprayed Ms. Glass in the eyes approximately six-inches away from her face.

199.    Defendant Clark's use of pepper spray on Ms. Glass was unnecessary, gratuitous, and objectively unreasonable.

200.    The way that Defendant Clark administered the pepper spray was also purposeful, knowing, and objectively unreasonable. On information and belief, manufacturer

Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB

recommendations and the Defendant County's own written policy mandates that the discharge of pepper spray be a minimum of three feet away from the person's face.

201.    At all times relevant, Defendant Clark was aware that officials using pepper spray must hold the can at least three feet from the person's face.

202.    Defendant Clark's blatant disregard of written policy and/or manufacturer recommendations caused Ms. Glass unreasonable physical, mental, and emotional pain.

203.    Defendant Clark's use of excessive force was premeditated: he continuously shook up his pepper-spray can even before Ms. Glass was brought into the room to be restrained. He continued shaking the can even after Ms. Glass's waist, wrists, and shoulders were strapped into the chair, rendering her immobile.

204.    As a direct and proximate result of these Defendants' unlawful and sadistic conduct, Ms. Glass suffered and will continue to suffer economic and non-economic damages for which these Defendants are liable, including, but not limited to, mental, emotional, and physical pain and suffering.

205.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 2
### FIRST-AMENDMENT RETALIATION AND FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983
### (AGAINST DEFENDANTS MARSH AND CLARK IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES)

206.    Plaintiff incorporates all previous allegations.

207.    Defendants Marsh and Clark restrained Ms. Glass in a restraint chair—and then attacked her—for requesting a phone call.

208.    In requesting a phone call, Ms. Glass was engaging in protected conduct under the First Amendment to the U.S. Constitution.

Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB

209.    It is commonly understood in the community that people who are arrested are allowed to make a phone call. Much like the right to remain silent or the right to an attorney, the right to make a phone call is commonly referenced in television programs depicting law-enforcement activities.

210.    Ms. Glass had a constitutional right to request a phone call. And as the mother of three children who needed to know where she was, it was reasonable for her to make that request.

211.    Defendants Marsh and Clark retaliated against Ms. Glass by strapping her to the restraint chair and attacking her for exercising her First Amendment rights.

212.    These Defendants' conduct caused Ms. Glass to unreasonable physical, mental, and emotional pain.

213.    As a direct and proximate result of these Defendants' unlawful conduct, Ms. Glass suffered and will continue to suffer economic and non-economic damages for which these Defendants are liable, including, but not limited to, mental, emotional, and physical pain and suffering.

214.    Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

### CLAIM 3
### INTENTIONAL TORT—ASSAULT
### AGAINST DEFENDANTS MARSH AND CLARK IN THEIR INDIVIDUAL CAPACITIES

215.    Plaintiff incorporates all previous allegations.

216.    Defendants Marsh and Clark's intentional actions caused Plaintiff reasonable apprehension of an immediate harmful or offensive contact.

217.    As a direct and proximate result of these Defendants' unlawful activity, Plaintiff has suffered and continues to suffer economic and non-economic damages for which these Defendants are liable.

Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB

218.    These Defendants' acts were willful, egregious, malicious, and worthy of substantial

sanction to punish and deter Defendants and others from engaging in this type of unlawful

conduct.

## CLAIM 4
### INTENTIONAL TORT—BATTERY
### (AGAINST DEFENDANTS MARSH AND CLARK IN THEIR INDIVIDUAL CAPACITIES)

219.    Plaintiff incorporates all previous allegations.

220.    Defendants Marsh and Clark engaged in the above-described actions intending to cause

the harmful contact and the harmful contact resulted. The offensive contacts were unlawful and

unwanted.

221.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff suffered

and will continue to suffer economic and non-economic damages for which these Defendants are

liable, including, but not limited to, mental, emotional, and physical pain and suffering.

222.    These Defendants' acts were willful, egregious, malicious, and worthy of substantial

sanction to punish and deter Defendants and others from engaging in this type of unlawful

conduct.

## CLAIM 5
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (AGAINST DEFENDANTS CLARK AND MARSH IN THEIR INDIVIDUAL CAPACITIES)

223.    Plaintiff incorporates all previous allegations.

224.    In conducting himself as he did, Defendant Clark either intended to cause emotional

distress or knew or should have known that the actions taken would result in serious emotional

distress to Plaintiff.

225.    Defendant Clark's conduct in pepper spraying Plaintiff approximately six inches away

from her face, while holding her head to prevent her from averting her eyes from the direct

spray, was extreme and outrageous. Defendant Clark's conduct in failing to decontaminate

Plaintiff from the pepper spray residue, continuing to restrain her, and failing to permit her to shower or change her clothing for two days was also extreme and outrageous. His conduct went beyond all possible bounds of human decency and was such that it could be considered intolerable in civilized society.

226.    In conducting himself as he did, Defendant Marsh either intended to cause emotional distress or knew or should have known that the actions taken would result in serious emotional distress to Plaintiff.

227.    Defendant Marsh's conduct in elbowing Plaintiff in her neck and punching Plaintiff in her face was extreme and outrageous. It went beyond all possible bounds of human decency and was such that it could be considered intolerable in civilized society.

228.    As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer mental anguish so serious and of such a nature that no reasonable person could be expected to endure it and for which these Defendants are liable.

229.    These Defendants' acts were willful, egregious, malicious, and worthy of substantial sanction to punish and deter Defendants and others from engaging in this type of unlawful conduct.

**CLAIM 6**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**(AGAINST DEFENDANTS CLARK AND MARSH IN THEIR INDIVIDUAL CAPACITIES)**

230.    Plaintiff incorporates all previous allegations.

231.    Plaintiff was subjected to physical peril at the hands of Defendants Clark and Marsh. As a direct and proximate result of these Defendants' unlawful conduct, Plaintiff has suffered and will continue to suffer serious mental anguish for which these Defendants are liable.

Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB

## CLAIM 7
## CIVIL LIABILITY CRIMINAL ACTS UNDER OHIO REV. CODE § 2307.60(A)(1)
### (AGAINST DEFENDANT CLARK IN HIS INDIVIDUAL CAPACITY)

232.    Plaintiff incorporates all previous allegations.

233.    The conduct complained of above constitutes criminal acts on the part of Defendant

Clark. The crimes include, but are not limited to,

    a.  felonious assault (Ohio Rev. Code § 2903.11(A)(1));

    b.  interfering with civil rights (Ohio Rev. Code § 2921.45(A)); and

    c.  unlawful restraint (Ohio Rev. Code § 2905.03(A)).

234.    As a direct and proximate result of Defendant Clark's criminal conduct, which showed a

spirit of ill-will, hatred, and wanton disregard of Plaintiff's rights, Plaintiff has suffered and will

continue to suffer economic and non-economic damages for which Defendant Clark is liable,

including, but not limited to mental, emotional, and physical pain and suffering, as well as

punitive damages.

235.    This Defendant's acts were willful, egregious, malicious, and worthy of substantial

sanction to punish and deter Defendant Clark and others from engaging in this type of unlawful

conduct.

## CLAIM 8
## CIVIL LIABILITY CRIMINAL ACTS UNDER OHIO REV. CODE § 2307.60(A)(1)
### (AGAINST DEFENDANT MARSH IN HIS INDIVIDUAL CAPACITY)

236.    Plaintiff incorporates all previous allegations.

237.    The conduct complained of above constitutes criminal acts on the part of Defendant

Marsh. The crimes include, but are not limited to,

    a.  assault (Ohio Rev. Code § 2903.13(A));

    b.  interfering with civil rights (Ohio Rev. Code § 2921.45(A)); and

    c.  unlawful restraint (Ohio Rev. Code § 2905.03(A)).

238.    As a direct and proximate result of Defendant Marsh's criminal conduct, which showed a

spirit of ill-will, hatred, and wanton disregard of Plaintiff's rights, Plaintiff suffered and will

continue to suffer economic and non-economic damages for which Defendant Marsh is liable,

including, but not limited to mental, emotional, and physical pain and suffering, as well as

punitive damages.

239.    This Defendant's acts were willful, egregious, malicious, and worthy of substantial

sanction to punish and deter Defendant Marsh and others from engaging in this type of unlawful

conduct.

## CLAIM 9
### FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983
### FOR A CUSTOM, POLICY, OR PRACTICE TOLERATING THE USE OF EXCESSIVE FORCE
### (AGAINST CUYAHOGA COUNTY)

240.    Plaintiff incorporates all previous allegations.

241.    Defendant Cuyahoga County permits, tolerates, and is deliberately indifferent to a

pattern and practice of excessive force by its corrections officers at the jail. This widespread

tolerance of excessive force by corrections officers constitutes a county policy, practice, or

custom, and led to Plaintiff being attacked on July 16, 2018.

242.    The behavior of Defendants Marsh and Clark, and all of the various corrections officers

depicted throughout the attached video footage, is part of a recurring pattern of excessive force

used on the people in custody at the Cuyahoga County Corrections Center.

243.    The corrections employees who witnessed the attack on Plaintiff and its aftermath failed

to demonstrate basic human empathy, barely reacting at all to the attack Defendants Marsh and

Clark inflicted on Plaintiff and failing to intervene to protect her from the savage and unjustified

violence Defendants Marsh and Clark inflicted. This callous indifference bespeaks a routine

character to this kind of brutal, sadistic violence as something wholly unremarkable or unusual to county corrections officers. To them this was just another day at the office.

244.    Based on previous instances of unjustified use of restraints and pepper spray, Defendant Cuyahoga County had notice of a pattern of constitutionally offensive acts by its corrections officers but failed to take any remedial steps in response to the notice.

245.    The culture of the punitive violence cultivated at the county jail was apparent to federal investigators who assessed the facility last year.

246.    According to the Quality Assurance Review of the Cuyahoga County Corrections Center, the United States Marshals Service found the following deficiencies related to use of force:

>   a.  "Review of Use of Force (UOF) incidents determined staff are not utilizing all tools and techniques generally accepted as best practices for UOF teams to ensure staff and detainee safety (i.e., confrontation avoidance, UOF team concept, team briefings and debriefings, removing staff involved at the on-set of the incident from the immediate area, and a review of all UOF incidents by the agency administrator or designee, and medical assessment of all involved). Additionally, video tapes involving UOF are not tagged and labeled as evidence. Written reports are not required from all persons involved in the use of force or any staff who played a role in the incident (i.e., medical, correctional personnel, SRT, etc.)." *Id.* at 35.
>
>   b.  "Over 100 detainee/inmate interviews reveal strong and consistent allegation of brutality, UOF punishment, and cruel treatment at the hands of Security Response Team (SRT), whom the detainee/inmates refer to as "The Men in Black," based on their black para-military uniforms." *Id.*'
>
>   c.  "During the review, review team members observed SRT members verbally abusing and demonstrating aggressive behavior towards detainees/inmates; review of multiple UOF and SRT body-cam video reveal and contain aggressive conduct and behavior as well as abusive, explicit language used by SRT members directed at detainees/inmates." *Id.*
>
>   d.  "SRT members who were escorting detainee/inmates to be interviewed by Facility Review Team members were referring to requested detainee/inmates as "Snitches," as they escorted them to and from the interview location. The threatening, intimidating and aggressive behavior demonstrated and witnessed by the Facility Review Team resulted in the request to remove up to 10

detainee/inmates from the CCCC, for fear of SRT members retaliation, and the legitimate fear of detainee/inmate safety." *Id.*

247. By permitting, tolerating, and sanctioning a persistent and widespread policy, practice, and custom of corrections officers using excessive force against people in custody, under which Plaintiff was assaulted, Defendant Cuyahoga County deprived Plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States.

248. As a direct and proximate result of the Defendant County's unlawful conduct, Plaintiff suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

## CLAIM 10
### FOURTEENTH AMENDMENT VIOLATION UNDER 42 U.S.C. § 1983
### FOR DELIBERATE INDIFFERENCE/FAILURE TO TRAIN AND SUPERVISE CORRECTIONS OFFICERS AND PERSONNEL WITHIN THE JAIL
### (AGAINST CUYAHOGA COUNTY)

249. Plaintiff incorporates all previous allegations.

250. Defendant Cuyahoga County permits, tolerates, and is deliberately indifferent to its failure to train and supervise corrections officers and other jail personnel including nurses on how to interact with people in custody, including how not to sadistically abuse them and how to provide medical care to people in urgent and evident distress (including failing to train them on properly decontaminating people subjected to pepper spray).

251. Defendant Cuyahoga County failed to train and supervise its corrections officers on how to use the best use of force tactics to ensure the safety of both staff and incarcerated citizens. The behavior of Defendants Marsh and Clark, and the other employees who did nothing while those Defendants abused Plaintiff, is consistent with a recurring pattern of how corrections officers

Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB

interact with people in custody at the Cuyahoga County Corrections Center, due to a lack of training and accountability.

252.   Defendant Cuyahoga County had notice of its failure to train and supervise its corrections personnel, which resulted in a pattern of constitutionally offensive acts by its corrections officers. But the Defendant County failed to take any remedial steps in response to the notice.

253.   On information and belief, Defendant Cuyahoga County has, despite notice, tolerated and nurtured its corrections officers' violent and abusive conduct by failing to intervene and prevent abuse.

254.   For example, Defendant Cuyahoga County tolerated and failed to prevent the incidents of excessive force against numerous incarcerated citizens including, but not limited to, Glenn Mayer Jr., Corrionne Lawrence, Tyrone Hipps, Jr., Joshua Castleberry, Terrence Debose, and others.

255.   According to the Quality Assurance Review of the Cuyahoga County Corrections Center, the United States Marshals Service found the following training deficiencies:

a.   "Denial of detainees/inmates to perform hygiene, detainees/inmates are not allowed access to showers, telephones and recreation due to CCCC's implementation of a lockdown system known as "Red Zone." The "Red Zone" RHU detainees/inmates management system is used as a means to address insufficient staff and staffing shortages. Detainees/inmates housed in the "Red Zone" RHU are locked down for periods of 27 or more hours in their cells, additionally interviews with detainees/inmates in the "Red Zone" RHU are lockdown, along with inspection of their cells reveal the absence of toothbrushes, toothpaste, toilet paper and denied access to razors or barbering." *Id.* at 4.

b.   "There is no internal quality control plan in place to provide an annual review of CCCC's operations to ensure compliance to ensure compliance with CCCC's policies and procedures. CCCC is inspected annually by the Ohio Department of Rehabilitation and Corrections' Bureau of Adult Detention to determine compliance with the Ohio's Minimum Standards for Adult Detention Centers. The last inspection was on November 14, 2017; review of the November 14, 2017 previous inspection documentation reveal CCCC's staff did not comply, address or provide corrective actions for identified deficiencies which included: exceeding rated capacity, lack of natural lighting in housing units, and detainees/inmates not

being provided with five hours a week of exercise. A corrective action plan to address the aforementioned identified deficiencies was not provided for review." *Id.* at 26.

c.  "Sheriff's Deputies provide transportation and outside escort for detainees/inmates. Therefore, Correctional Officers do not carry firearms, nor do they receive specialized firearms training. Staff authorized to use chemical agents receive required training. A review of management and supervisory staff training files reveal management and supervisory staff receive 40 hours of management and supervisory training during their first year and only 8 hours annually as required by the Ohio Minimum Adult Detention Standards. FPBDS requires management and supervisory staff receive an initial 40 hours training the first year and 24 hours thereafter." *Id.* at 28-29.

d.  "There is no policy in place requiring notification to the agency of jurisdiction of serious incidents involving detainees/inmates. Additionally, no documentation was provided for review to support the practice of external agency notifications." *Id.* at 29.

e.  "Interview with staff reveal numerous staff at all levels express concerns for their safety and security due to staffing shortages; concerns were also expressed regarding morale and sense of inability to make changes or voice concerns to leadership or management." *Id.* at 29.

256.  By permitting, tolerating, and sanctioning a persistent and widespread policy, practice, and custom of deliberate indifference to failing to train and supervise corrections officers (1) not to use excessive force including use of restraints and/or chemical agents like pepper spray or (2) to provide medical care to people in distress, under which Plaintiff was assaulted and did not receive timely medical care for injuries she sustained when attacked by corrections officers, Defendant Cuyahoga County deprived Plaintiff of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States.

257.  As a direct and proximate result of Defendant Cuyahoga County's unlawful conduct, Plaintiff suffered and will continue to suffer economic and non-economic damages for which this Defendant is liable, including, but not limited to, mental, emotional, and physical pain and suffering.

Electronically Filed 07/09/2019 22:31 / / CV 19 917942 / Confirmation Nbr. 1757630 / CLAJB

**PRAYER FOR RELIEF**

For the reasons stated above, Ms. Glass respectfully requests the following relief from the Court:

A.  Declare that Defendants' acts and conduct constitute violations of the First and Fourteenth Amendments to the United States Constitution, as well as of 42 U.S.C. § 1983 and state law;

B.  Enter judgment in Ms. Glass's favor on all claims for relief;

C.  Award full compensatory damages including, but not limited to, damages for pain and suffering, mental anguish, emotional distress, humiliation, embarrassment, and inconvenience that Ms. Glass has suffered and is reasonably certain to suffer in the future;

D.  Award punitive and exemplary damages for the individual Defendants' egregious, willful, and malicious conduct;

E.  Award pre- and post-judgment interest at the highest lawful rate;

F.  Award Ms. Glass her reasonable attorneys' fees and all other costs of suit;

G.  Enjoin Defendants from perpetrating further unlawful acts such as the ones that injured Plaintiff; and

H.  Award all other relief in law or equity, including injunctive relief, to which Ms. Glass is entitled and that the Court deems equitable, just, and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues within this complaint.

Dated: July 9, 2019               Respectfully submitted,

THE CHANDRA LAW FIRM LLC

*/s/ Ashlie Case Sletvold*
Subodh Chandra (Ohio Bar No. 0069233)
Ashlie Case Sletvold (Ohio Bar No. 0079477)
Brian Bardwell (Ohio Bar No. 0098423)
The Chandra Law Building
1265 W. 6th St., Suite 400
Cleveland, Ohio 44113
216.578.1700 Phone
216.578.1800 Fax
Subodh.Chandra@ChandraLaw.com
Ashlie.Sletvold@ChandraLaw.com
Brian.Bardwell@ChandraLaw.com

*Attorneys for Plaintiff Chantelle Glass*